Filed 8/19/20  Singleton v. Friedberg CA4/1

# NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## COURT OF APPEAL, FOURTH APPELLATE DISTRICT

## DIVISION ONE

## STATE OF CALIFORNIA

| | |
|---|---|
| TERRY L. SINGLETON et al., | D076029 |
| Plaintiffs and Respondents, | |
| v. | (Super. Ct. No. 37-2014-00016556-CU-OR-CTL) |
| THOMAS F. FRIEDBERG et al., | |
| Defendants and Appellants; | |
| CREATIVE SMARTSCAPE, | |
| Defendant and Respondent. | |

APPEAL from a judgment of the Superior Court of San Diego County, Katherine A. Bacal, Judge.  Affirmed.

Law Office of John W. Cutchin and John W. Cutchin for Defendants and Appellants Thomas F. Friedberg and Sarah L. Bunge.

Daley & Heft, Lee H. Roistacher and Samuel C. Gazzo for Defendant and Respondent Creative Smartscape, Inc.

The Viviano Law Firm and Charles A. Viviano; Blain Morrison Law Corporation and Rebecca Blain Morrison for Plaintiffs and Respondents.

Appellants Thomas F. Friedberg and Sarah Bunge appeal the trial court's order enforcing a settlement pursuant to Code of Civil Procedure section 664.6, and in particular the court's decision that the underlying settlement agreement required them to remove a tree blocking their neighbors' view.[1]  Appellants challenge the court's interpretation of the settlement agreement, argue the settlement agreement was unenforceable, and contend the court's determination that the tree needed to be removed was not supported by substantial evidence.  We reject all of these contentions and affirm the court's decision.

FACTUAL AND PROCEDURAL BACKGROUND

In 2014, appellants were sued by their neighbors, Terry L. Singleton and Margaret R. Singleton, individually and as trustees of a family trust (the Singletons).[2]  The underlying dispute concerned such issues as a common wall appellants had installed on the Singletons' side of the property line,

---

[1]  Further statutory references are to the Code of Civil Procedure unless otherwise specified.

[2]  Because the record does not include any of the filings that preceded the parties' global settlement, our understanding of the presettlement proceedings is derived from information in the parties' appellate briefs and in papers filed in support of the parties' cross-motions to enforce the settlement agreement in the trial court.  Yet even this information is incomplete.  Although the underlying action apparently consisted of two consolidated lawsuits, and unspecified "claims, cross-claims, and counterclaims," we are not told what the specific causes of action were or how the parties were aligned as to each of them.  However, we are able to decide the merits of this appeal without this information.  The settlement, which we conclude was enforceable, resulted in dismissal of the entire action.  Thereafter, the trial court retained jurisdiction under section 664.6 only to enforce the settlement agreement.  This appeal involves only a challenge to the trial court's order enforcing the settlement, which we can resolve on this record without additional information regarding the dismissed claims.

2

overgrown vegetation in appellants' yard, and, of singular importance in this appeal, a podocarpus tree[3] that blocked the Singletons' view. Appellants, in turn, sued Creative Smartscape, Inc. (Smartscape), the builder of the common wall.

On July 11, 2018, the day of trial, the parties consented to a settlement conference before the trial judge. This effort succeeded, and the following settlement was placed on the record:

> "[THE COURT]: There will be an easement granted by the Singletons to Friedberg-Bunge for [the common] wall [between their properties]. The Friedberg-Bunge attorney will prepare the formal easement.
>
> "Mr. Friedberg, Ms. Bunge will pay to the Singletons the sum of $150,000. That will be paid within five court days of the recording of the easement.
>
> "The Podocarpus tree on the Friedberg-Bunge property will be trimmed to their roofline, that's their highest roofline, if the tree can handle it.
>
> "Their arborist, Mr. [Safford], will prepare a proposal and provide it to counsel, Mr. Prindle, who will then distribute it to the plaintiffs, defendants, and anyone else who has an interest and a request.
>
> "The report will include how far the tree can be trimmed and can handle it. Mr. [Safford] will also review the other trees on the Friedberg-Bunge property and make a recommendation as to their trimming.
>
> "If the tree cannot be trimmed to an appropriate height, as an alternate to the trimming of the Podocarpus tree, the Podocarpus tree will be removed and replaced.

---

[3] Podocarpus is "a genus of evergreen trees (family *Taxaceae*) widely distributed in the southern hemisphere and having a pulpy fruit with one hard seed[.]" (Webster's 3d New Internat. Dict. (2002) p. 1748, col. 2.)

"The Singletons will contribute $50,000 to the removal and replacement. SmartScape will contribute $10,000 to the removal and replacement.

"SmartScape will also pay, not as an alternative, but as a part of the general settlement, the sum of $10,000 to the Singletons.

"Mr. [Safford] will prepare his proposal by July 17th. And the tree, if it is going to be trimmed, will be trimmed by the end of the month.

"All parties will bear their own costs and attorneys' fees.

"This Court will retain jurisdiction under [section] 664.6. The case will be dismissed with prejudice."

After reciting these terms, the court had the following exchange with appellants' counsel:

"THE COURT: Mr. Prindle, anything that you wanted to add or clarify?

"MR. PRINDLE: One of the phrases about trimming the tree, I think, was 'if the tree can take it.' Maybe we need to define that a little bit more. Is that—I don't want something to be so vague.

"He's going to have to decide whether it can be trimmed without endangering the health or esthetics of the tree.

"THE COURT: Why don't we say we'll trim the tree to whatever amount the tree can handle and remain healthy.

"Does that satisfy? It's a proposal.

"MR. PRINDLE: Yeah. I guess we're saying whatever degree Mr. [Safford] thinks it can be trimmed to accommodate those things.

"THE COURT: Right. Okay. Good."

4

The parties thereafter agreed on the record that they had heard and understood the terms of the settlement, had no questions, had been provided sufficient time to consult with counsel, and understood that if the agreement was made the order of the court, they would be bound by it. The court found the parties had entered into a "knowing, voluntary, and intelligent settlement agreement which is the order of the Court," ordered the action dismissed with prejudice, and "retained jurisdiction to enforce the terms of the settlements that have been recited on the record pursuant to section 664.6."

Unfortunately, disputes arose soon thereafter, culminating in cross-motions to enforce the settlement agreement under section 664.6. Our understanding of what occurred after the settlement proceeding is based on the information and evidence submitted with these cross-motions.

On July 17, 2018, as contemplated by the terms of the parties' settlement, the arborist submitted his report. It stated in part:

> "This brief report and proposal follows the inspection of your large Podocarpus gracilior that you requested I make to consider reducing its height to accommodate your neighbor's view. To reduce the canopy to the level of the apex of the gazebo would seriously degrade the health and dignity of this tree. To make the large heading cuts necessary to so drastically reduce the tree would surely result in decay at the point where new growth would sprout out after the heading. Furthermore, the natural shape of the tree would be compromised.

> "I am recommending reducing the canopy of the tree only 4-6 feet using a less drastic technique called drop crotch pruning which reduces a larger higher branch back to another lateral branch to reduce sucker growth and maintain the more natural look of the rounded canopy."

5

On July 23, 2018, appellants' counsel, Patrick L. Prindle, sent an e-mail to counsel for the Singletons, notifying him that appellants intended to have the podocarpus trimmed as recommended by the arborist. Two weeks later, Prindle advised that the trimming had been completed.

At this point, a dispute arose over whether appellants had satisfied their obligations under the settlement agreement by trimming the tree in accordance with their arborist's recommendation. The Singletons claimed the trimming was insufficient and that the tree would have to be removed since it could not be lowered any further.

Appellants maintained they had fully discharged their obligations by trimming the tree, although their reasoning in support of this position varied. In an August 8, 2018 letter to the Singletons' attorney, Prindle asserted that his clients had trimmed the podocarpus to the correct height, a conclusion he reached by claiming an antenna on their roof qualified as their "highest roof line." In an October 11, 2018 e-mail, Prindle changed course and claimed his clients believed the Singletons had forfeited their right to insist on removal of the tree by failing to object to the arborist's recommendation before the tree was trimmed. Prindle claimed "the transcript of the settlement" supported his clients' position, although he offered no citations to the part of the transcript that contained the purported objection requirement. Although he consistently opposed the tree's removal, in each of these communications Prindle acknowledged the settlement agreement required removal of the tree if it could not be lowered to his clients' highest roofline.

The standoff persisted, and on January 3, 2019, the Singletons filed a motion to enforce the settlement agreement under section 664.6. They argued the settlement required appellants to trim the podocarpus to their highest roofline, "conditioned on Mr. Safford's determination that the tree

6

could handle it." They noted that the arborist's report had cautioned against trimming the podocarpus to the apex of appellants' gazebo and had recommended a lesser reduction of four to six feet. Not only was the apex of appellants' gazebo the wrong roofline, the Singletons argued, but the tree had not even been lowered to this level. They claimed appellants were therefore in breach of the agreement and requested that the court issue an order instructing appellants to remove the tree.

In opposition to the Singletons' motion, appellants, represented by new counsel (including Friedberg himself), argued the settlement had never required them to remove the podocarpus. According to appellants, when the court stated during the settlement proceedings, "Why don't we say we'll trim the tree to whatever amount the tree can handle and remain healthy," it had proposed a new settlement term that superseded the earlier terms relating to the tree. Thus, the removal requirement had been withdrawn, and they were not in breach because they had trimmed the podocarpus in accordance with their arborist's recommendations, which was all the settlement agreement required them to do.

Meanwhile, appellants filed their own motion to enforce the settlement agreement in which they sought an order compelling the Singletons to execute the easement for the common wall[4] and requiring the Singletons to provide their taxpayer identification numbers, information appellants' insurer apparently required before it would issue the $150,000 settlement payment to the Singletons.

---

[4]    A copy of the proposed easement was submitted in support of the motion. Apparently, the Singletons had refused to sign it, not because of any objection to its contents, but because of their belief appellants were already in breach of the settlement agreement, relieving them of their own duty to perform.

The hearing on both motions was set for March 1, 2019. On February 28, 2019, the court issued a tentative ruling stating its intention to grant each motion in part,[5] order the Singletons to execute the easement within five court days, and order appellants to remove the podocarpus tree within 45 days. In the tentative ruling, the court found the settlement agreement "straight-forward, with three main parts:

> "- Friedberg/Bunge will either trim their Podocarpus tree or, if the tree cannot be trimmed to the appropriate height, they will remove and replace it, with the Singletons and Smartscape contributing to the removal and replacement;

> "- the Singletons will give Friedberg/Bunge a formal easement for the common wall; and

> "- Smartscape was to pay the Singletons $10,000, separate and apart from potential contribution for removing the tree."

The court reasoned that while appellants "contend that the tree only needed to be trimmed if it could handle such a trimming and remain healthy," this interpretation ignored the following terms of the agreement:

> "Under the agreement, Friedberg/Bunge's arborist (Mr. Safford) was to report on how far Friedberg/Bunge's Podocarpus tree could be trimmed and remain healthy. [Citation.] If Mr. Safford said the tree could be trimmed to Friedberg/Bunge's highest roofline, then the tree was to be trimmed. [Citation.] However, if the tree could not be so trimmed, it would be removed and replaced, with the Singletons contributing $50,000 and Smartscape contributing $10,000."

The court also found the arborist's report failed to demonstrate that trimming the podocarpus tree to the apex of appellants' gazebo would

---

[5] In addition to seeking removal of the tree, the Singletons had also asked the court to order appellants to trim other vegetation, and they had requested sanctions.

8

compromise its health. In the court's view, the arborist's reference to "compromis[ing] the shape of the tree" was a matter of esthetics rather than health, and the prediction that "new growth" would sprout was an indication the tree would survive. The court nevertheless concluded that removal of the tree was warranted: "[S]ince Friedberg/Bunge are apparently of the view that the tree cannot be reduced to the agreed-upon height, it must be removed and replaced."[6]

During the hearing on the parties' motions, a dispute arose regarding the timing of the parties' exchange of their respective settlement payments. The court continued the hearing to March 22, 2019, stating it would issue a new tentative ruling to resolve these additional issues. On March 5, 2019, the court issued the new tentative ruling, which was substantively identical to its prior tentative, except that the new tentative ruling included the deadlines by which the parties were to exchange their settlement payments and added the following sentence to the court's analysis of the arborist's report: "Mr. Safford did not state that the required trimming would kill or substantially injure the tree."

On March 11, 2019, appellants applied ex parte for permission to file a supplemental declaration and report from Mr. Safford stating that trimming the tree further "would ultimately risk the survivability of the tree." The court denied the application, indicating it had already issued its revised tentative ruling and was "not inclined to hear further evidence."

---

[6] The court denied the Singletons' request for an order requiring trimming the other vegetation, finding insufficient evidence it had not already been trimmed, and further denied their request for sanctions. It also refused to require the Singletons to provide taxpayer identification information to appellants, finding this was not one of the terms of the settlement.

Following the March 22, 2019 hearing, the court issued a minute order confirming its March 5, 2019 tentative ruling. On April 26, 2019, appellants timely appealed this minute order.[7]

## DISCUSSION

Appellants challenge the portion of the minute order requiring them to remove the podocarpus tree. Appellants contend that the trial court misinterpreted the settlement agreement, that the version of the settlement agreement adopted by the trial court was unenforceable because it was uncertain or missing material terms, that there was no "meeting of the minds" regarding the requirements governing the podocarpus tree, and that the court's determination that the tree needed to be removed was not supported by substantial evidence.

### I.

### *Governing Law and Standard of Review*

The minute order was entered pursuant to section 664.6, which provides: "If parties to pending litigation stipulate, in a writing signed by the parties outside the presence of the court or orally before the court, for settlement of the case, or part thereof, the court, upon motion, may enter judgment pursuant to the terms of the settlement. If requested by the parties, the court may retain jurisdiction over the parties to enforce the settlement until performance in full of the terms of the settlement."

---

[7] No judgment was requested, presented, or entered in the trial court. However, a minute order granting a motion to enter judgment under section 664.6 constitutes an appealable order where, as here, "it purports to finally resolve all issues between these particular parties [citations], required no further judicial action and left nothing to be done but to enforce what had been determined [citations], and enforced the parties' settlement agreement. [Citations]" (*Pangborn Plumbing Corp. v. Carruthers & Skiffington* (2002) 97 Cal.App.4th 1039, 1046, fn. 3.)

10

Section 664.6 " 'created a summary, expedited procedure to enforce settlement agreements when certain requirements that decrease the likelihood of misunderstandings are met.  Thus the statute requires the "parties" to stipulate in writing or orally before the court that they have settled the case.  The litigants' direct participation tends to ensure that the settlement is the result of their mature reflection and deliberate assent.  This protects the parties against hasty and improvident settlement agreements by impressing upon them the seriousness and finality of the decision to settle, and minimizes the possibility of conflicting interpretations of the settlement. . . .  It also protects parties from impairment of their substantial rights without their knowledge and consent.' " (*Elyaoudayan v. Hoffman* (2003) 104 Cal.App.4th 1421, 1429, quoting *Levy v. Superior Court* (1995) 10 Cal.4th 578, 585.)

When presented with a motion pursuant to section 664.6, "[i]t is for the trial court to determine in the first instance whether the parties have entered into an enforceable settlement." (*Osumi v. Sutton* (2007) 151 Cal.App.4th 1355, 1360 (*Osumi*).)  "In making that determination, 'the trial court acts as the trier of fact, determining whether the parties entered into a valid and binding settlement.  [Citation.]  Trial judges may consider oral testimony or may determine the motion upon declarations alone.  [Citation.]  When the same judge hears the settlement and the motion to enter judgment on the settlement, he or she may consult his or her memory.  [Citation]' " (*Ibid.*)

"A trial court's factual findings on a motion to enforce a settlement pursuant to section 664.6 are subject to limited appellate review and will not be disturbed if supported by substantial evidence." (*Machado v. Myers* (2019) 39 Cal.App.5th 779, 790-791 (*Machado*).)  Where the resolution of a section 664.6 motion raises questions of law, they are reviewed de novo.  (*Id.*

11

at p. 791; see *Provost v. Regents of University of California* (2011) 201 Cal.App.4th 1289, 1301 (*Provost*) [reviewing de novo whether the terms of a settlement agreement were too uncertain to enforce].)

II.

*The Trial Court's Interpretation of the Settlement Agreement*
*Was Not Erroneous*

Appellants challenge the trial court's interpretation of the settlement provisions governing the fate of the podocarpus tree. The trial court viewed the agreement as "straight forward" and found it contained the following pertinent provisions relating to the tree: "[the] arborist was to report on how far [appellants'] Podocarpus tree could be trimmed and remain healthy. [Citation.] . . . [I]f the tree could not be so trimmed, it would be removed and replaced . . . ." Appellants dispute this interpretation and contend the trial court's statement during the settlement proceedings—"Why don't we say we'll trim the tree to whatever amount the tree can handle and remain healthy"—was a proposal of an alternative settlement term intended to supersede the earlier terms relating to the tree. As a result, appellants contend, the settlement agreement merely required them "to reduce the height of the Podocarpus tree as low as the arborist said the tree could be trimmed and remain healthy," and did not require them to remove the tree.

Although appellants characterize these arguments as raising a substantial evidence challenge to the trial court's interpretation of the settlement agreement, they do not actually dispute any underlying findings of fact by the court. Instead, they argue the plain language of the settlement transcript supports their interpretation of the agreement. Their challenge thus presents issues of contract interpretation subject to de novo review. (*Weddington Productions, Inc. v. Flick* (1998) 60 Cal.App.4th 793, 810-811

12

(*Weddington*) ["A settlement agreement is a contract, and the legal principles which apply to contracts generally apply to settlement contracts."]; accord *Estate of Thottam* (2008) 165 Cal.App.4th 1331, 1340.) " 'When considering a question of contractual interpretation, we apply the following rules. "A contract must be so interpreted as to give effect to the mutual intention of the parties as it existed at the time of contracting, so far as the same is ascertainable and lawful." [Citation.] "The language of a contract is to govern its interpretation, if the language is clear and explicit, and does not involve an absurdity." [Citation.]' " (*Horath v. Hess* (2014) 225 Cal.App.4th 456, 463 (*Horath*).)

" 'When a dispute arises over the meaning of contract language, the first question to be decided is whether the language is "reasonably susceptible" to the interpretation urged by the party. If it is not, the case is over. [Citation.] If the court decides the language is reasonably susceptible to the interpretation urged, the court moves to the second question: what did the parties intend the language to mean? [Citation.]' " (*Horath*, *supra*, 225 Cal.App.4th at p. 464.) "If a contract is susceptible to two different reasonable interpretations, the contract is ambiguous." (*Ibid*.) " 'A court must then construe that ambiguous contract language 'by applying the standard rules of interpretation in order to give effect to the mutual intention of the parties.' " (*Ibid*.) "On appeal, a 'trial court's ruling on the threshold determination of "ambiguity" (i.e., whether the proffered evidence is relevant to prove a meaning to which the language is reasonably susceptible) is a question of law, not of fact. [Citation.] Thus[,] the threshold determination of ambiguity is subject to independent review.' " (*Ibid*.)

Applying these principles, we reject appellants' contention that the trial court erred when it interpreted the settlement agreement as including the

13

requirement that they trim the podocarpus to their highest roofline or else remove the tree. Appellants have failed to overcome the threshold requirement of demonstrating the settlement agreement is reasonably susceptible to their interpretation.

The settlement transcript, which serves as the operative agreement and which we therefore consider as a whole, does not support appellants' interpretation of the agreement. (Civ. Code, § 1641 ["The whole of a contract is to be taken together, so as to give effect to every part, if reasonably practicable, each clause helping to interpret the other."].) Earlier in the proceedings, the court recited the following settlement terms relating to the podocarpus:

> "The Podocarpus tree on the Friedberg-Bunge property will be trimmed to their roof line, that's their highest roof line, if the tree can handle it.
>
> "Their arborist, Mr. [Safford], will prepare a proposal and provide it to counsel, Mr. Prindle, who will then distribute it to the plaintiffs, defendants, and anyone else who has an interest and a request.
>
> "The report will include how far the tree can be trimmed and can handle it. Mr. [Safford] will also review the other trees on the Friedberg-Bunge property and make a recommendation as to their trimming.
>
> "If the tree cannot be trimmed to an appropriate height, as an alternate to the trimming of the Podocarpus tree, the Podocarpus tree will be removed and replaced.
>
> "The Singletons will contribute $50,000 to the removal and replacement. SmartScape will contribute $10,000 to the removal and replacement."

The court made the statement at issue in this appeal during this subsequent exchange with appellants' counsel:

14

"THE COURT: Mr. Prindle, anything that you wanted to add or clarify?

"MR. PRINDLE: One of the phrases about trimming the tree, I think, was 'if the tree can take it.' Maybe we need to define that a little bit more. Is that—I don't want something to be so vague.

"He's going to have to decide whether it can be trimmed without endangering the health or esthetics of the tree.

"THE COURT: *Why don't we say we'll trim the tree to whatever amount the tree can handle and remain healthy*.

"Does that satisfy? It's a proposal.

"MR. PRINDLE: Yeah. I guess we're saying whatever degree Mr. [Safford] thinks it can be trimmed to accommodate those things.

"THE COURT: Right. Okay. Good." (Italics added.)

Read in context, the court's statement is not reasonably susceptible to appellants' contention that the court was proposing a new settlement term intended to supersede the earlier provisions relating to the podocarpus tree. First, the court was responding to appellants' counsel's stated concern that "we need to define" the phrase "if the tree can take it," since he did not want a provision "to be so vague." Although the words "*if the tree can take it*" are slightly different from the court's actual words, "*if the tree can handle it*," given that this was an oral proceeding, it is sufficiently clear he was referring to the latter phrase. The court's response to a request for a definition is most readily taken as just that—an offer of a definition for an existing settlement term—not a modification and replacement of a material component of the parties' agreement. Second, if either appellants' counsel or the court had meant to supersede, rather than clarify, the earlier provisions, we would expect them to have said so, including by using words like "withdraw" or

15

"supersede" that are commonly used for that purpose. (Civ. Code, § 1638 ["The language of a contract is to govern its interpretation, if the language is clear and explicit, and does not involve an absurdity."].) Nothing in the words of this exchange indicates any such intent. Instead, the court's statement is reasonably susceptible to only one interpretation, namely that the court intended to clarify what was meant by the requirement that the tree would be trimmed if it could "handle it"—a determination that would be based on whether the tree would "remain healthy" after being trimmed to the highest roofline. This view is consistent with the interpretation adopted by the trial court.

Appellants point out that after reciting the terms of the settlement, the court asked: "Ms. Bunge and Mr. Friedberg, did you hear the terms of the agreement cited by me *with the clarifications made by counsel*?" They apparently regard the italicized words as an indication the court's exchange with their counsel was intended to supersede, rather than clarify, the terms relating to the podocarpus tree. However, the court's use of the word "clarifications" only supports the conclusion appellants are trying to avoid, namely that the exchange with their counsel merely resulted in a clarification, not a replacement, of the earlier provisions relating to the tree.

Appellants also argue that since the settlement agreement required other vegetation on their property to be trimmed based on the recommendation of the arborist, the same trimming standard must also have applied to the podocarpus tree. Yet the settlement agreement was structured to address the trimming requirements for the podocarpus separately from the requirements for appellants' other vegetation, which suggests the parties intended different standards to apply to each. Appellants make a related, equally unsupported argument that there is "no evidence" the parties agreed

16

to give the arborist the power to determine the fate of the tree.  Yet the record shows the parties gave the arborist precisely this authority when they expressly agreed his opinion would determine the degree to which the tree could be trimmed.

Next, appellants claim the trial court must have meant to replace the earlier provisions relating to the podocarpus, because, they maintain, the earlier provisions contained uncertain terms (namely, "highest roofline" and "appropriate height") or were missing material terms.  However, none of these purported deficiencies was raised by their attorney at the time of the settlement.  Instead, the only uncertainty appellants' counsel identified, and the only uncertainty the court was attempting to address in providing its clarification, was the potential ambiguity in the phrase "handle it."  Nothing in the record supports appellants' position that the court was attempting to address any other concerns, including the ones they raise here.  Moreover, their claims of uncertainty and omitted material terms are meritless, as we discuss in section III, *post*.

Finally, as an additional basis for rejecting appellants' challenge, we note that if their interpretation were adopted, it would render parts of the settlement agreement superfluous.  "A contract term should not be construed to render some of its provisions meaningless or irrelevant." (*Estate of Petersen* (1994) 28 Cal.App.4th 1742, 1753, fn. 4.)  "We must give significance to every word of a contract, when possible, and avoid an interpretation that renders a word surplusage." (*In re Tobacco Cases I* (2010) 186 Cal.App.4th 42, 49.)  If the court intended to eliminate any possibility of removing the podocarpus as appellants contend, then the terms under which the Singletons were to contribute $50,000, and Smartscape $10,000, to the removal and replacement of the tree, would never take effect.  Appellants try to avoid this

17

problem by asserting that these contingencies were also superseded. We reject this assertion because it is not supported by the transcript.

In sum, because appellants have failed to demonstrate that the court's mid-proceeding statement is reasonably susceptible to their interpretation that it was intended to supersede, rather than clarify, the earlier provisions relating to trimming or removal of the tree, we find no ambiguity in the settlement agreement and conclude it was correctly interpreted by the trial court.

III.

*The Settlement Provisions Governing the Podocarpus Tree
Were Not Unenforceable*

Appellants appear to contend that the settlement agreement, as interpreted by the trial court, was unenforceable because the terms "highest roofline" and "appropriate height" are uncertain, and because it omitted material terms.

Appellants forfeited these arguments because they failed to raise them in the trial court. " 'New theories of defense, just like new theories of liability, may not be asserted for the first time on appeal.' " (*Nellie Gail Ranch Owners Assn. v. McMullin* (2016) 4 Cal.App.5th 982, 997.)

Even if appellants had properly preserved these arguments, we would reject them. "A settlement is enforceable so long as it is 'sufficiently certain to make the precise act which is to be done clearly ascertainable.' " (*Provost, supra*, 201 Cal.App.4th at p. 1301, quoting Civ. Code, § 3390, subd. (5).) There is nothing ambiguous about the phrase "highest roofline." A "roofline" is simply "the outline of a rooftop" (Random House Unabridged Dict. (2d ed. 1993) p. 1670), and the "highest" roofline would be the one that stands above the rest. (Appellants apparently have more than one roof.) This is a natural

reference point for trimming the tree to restore the Singletons' view, since it would lower the tree to the level where it no longer blocked their line of sight. To the extent appellants argue the agreement was uncertain because it failed to specify *which* of their rooflines was the highest one, their argument ignores the principle "[t]hat is certain which can be made certain." (Civ. Code, § 3538; see *Otey v. Carmel Sanitary Dist.* (1933) 219 Cal. 310, 313 [holding the failure to fix the "ordinary high water mark" referenced in a judgment did not render it uncertain, since the ordinary high water mark was readily ascertainable at any time].) Here, it was not necessary to define which of appellants' rooflines was the highest, because this was an objective matter that could be readily ascertained.

While appellants point out that following the settlement, the parties were not able to agree on appellants' "highest roofline," this postsettlement dispute is not an indication the term was uncertain.[8] Extrinsic evidence is

---

[8]    Moreover, appellants contributed to the dispute by claiming a rooftop antenna qualified as their "highest roofline," a position they arrived at by relying on City of San Diego Technical Bulletin BLDG-5-4. This technical bulletin had no conceivable relevance to the interpretation of the settlement agreement. Its stated purpose was to "illustrate how building height is determined for buildings and structures in the Coastal Height Limitation Overlay Zone," a circumscribed coastal area in which the height limit for buildings and structures, defined to include antennas, is 30 feet. (City of San Diego Technical Bulletin BLDG-5-4, §§ I, II.B.) The settlement phrase "highest roofline" was intended to create a reference point for the height of a tree, not a building. Moreover, nothing in the record indicates the parties agreed the technical bulletin would govern the determination of appellants' "highest roofline." (*Medical Staff of Doctors Medical Center in Modesto v. Kamil* (2005) 132 Cal.App.4th 679, 683 ["The words of the contract are given their ordinary and popular meaning unless used by the parties in a technical sense."].) Thus, appellants' postsettlement dispute regarding the meaning of "highest roofline," even if it were relevant, would not be persuasive evidence of the agreement's uncertainty.

admissible to explain an ambiguity, not to create one.  (*Weber v. Dobyns* (1961) 193 Cal.App.2d 402, 406; *Associated Lathing & Plastering Co. v. Louis C. Dunn, Inc.* (1955) 135 Cal.App.2d 40, 46.)

As for the words "appropriate height," although they might seem vague in the abstract, in context ("[i]f the tree cannot be trimmed to an *appropriate height*"), they were a clear reference to appellants' highest roofline—the height to which the podocarpus tree was to be reduced.  (Civ. Code, § 1641.)  Accordingly, this term was not uncertain.

Appellants also appear to argue the settlement agreement was unenforceable because it was missing material terms, such as "who would decide on the 'appropriate height' or the 'highest roofline' to which the tree would be trimmed," a process for objecting to the arborist's recommendation, a timeline for raising objections, and a procedure for resolving disputes over the arborist's recommendation.

This, too, is a meritless position.  Nothing in the record indicates any of these purportedly missing terms were important to the parties at the time of settlement.  (See *Weddington*, *supra*, 60 Cal.App.4th at pp. 799, 815 [finding a licensing agreement was material to the parties' settlement where their settlement memorandum required them to "formalize a Licensing Agreement" and the evidence demonstrated the critical importance of the licensing agreement to all sides].)  Moreover, "[i]t is well settled that an agreement definite in its essential elements is not rendered unenforceable by reason of uncertainty in some minor, nonessential detail."  (1 Witkin, Summary of Cal. Law (11th ed. 2017) Contracts, § 146, p. 186.)  At most, the alleged omissions are "not material contract terms but details adjunct to the substance of the agreement."  (*Provost*, *supra*, 201 Cal.App.4th at p. 1302 [where stipulated settlement required human resources to respond to

prospective employers' requests with an agreed-upon neutral response, absence of provisions in the contract specifying who in human resources would handle inquiries or how all references would be handled were not material terms].)  Accordingly, the omission of these details did not render the settlement agreement unenforceable.

## IV.

### *Appellants' "Meeting of the Minds" Argument Fails*

Appellants contend that since they had a different understanding of the settlement agreement than the Singletons, there was "never a meeting of the minds and no enforceable agreement was reached."

Appellants have forfeited this issue by raising it for the first time in their reply brief without demonstrating good cause for failing to raise it sooner.  (See *American Drug Stores, Inc. v. Stroh* (1992) 10 Cal.App.4th 1446, 1453 ["Points raised for the first time in a reply brief will ordinarily not be considered, because such consideration would deprive the respondent of an opportunity to counter the argument."]; accord, *Shade Foods, Inc. v. Innovative Products Sales & Marketing, Inc.* (2000) 78 Cal.App.4th 847, 894, fn. 10.)[9]

Moreover, appellants' position lacks merit because it is based on the mistaken notion that contract formation requires a subjective "meeting of the minds."  "California recognizes the objective theory of contracts [citation], under which '[i]t is the objective intent, as evidenced by the words of the contract, rather than the subjective intent of one of the parties, that controls

---

[9]     We construe this "meeting of the minds" argument to be separate from appellants' contention that the settlement agreement was unenforceable because some terms lacked certainty.  Regardless of whether they were intended to be separate arguments, or variations on the same claim, we find appellants' contentions unpersuasive and reject them.

interpretation' [citation]." (*Founding Members of the Newport Beach Country Club v. Newport Beach Country Club, Inc.* (2003) 109 Cal.App.4th 944, 956.) "The parties' undisclosed intent or understanding is irrelevant to contract interpretation." (*Ibid.*; see *Blumenfeld v. R. H. Macy & Co.* (1979) 92 Cal.App.3d 38, 46 ["Under the objective test of contract formation, a 'meeting of the minds' is unnecessary. A party is bound, even if he misunderstood the terms of a contract and actually had a different, undisclosed intention."]; *Beard v. Goodrich* (2003) 110 Cal.App.4th 1031, 1039-1040 [rejecting plaintiff's " 'no meeting of the minds' " argument because it was based on plaintiff's "subjective intent"].) Thus, appellants' undisclosed belief that the settlement merely required them to trim their podocarpus, not to remove it, is irrelevant to the question of whether an enforceable contract was formed.

It is true that unilateral mistake may serve as a basis for rescission. (Civ. Code, §§ 1577, 1578, 1689, subd. (b)(1).) Here, appellants claim that they were unilaterally mistaken as to the true meaning of the settlement agreement, which is, "at most," a mistake of law. (*Hedging Concepts, Inc. v. First Alliance Mortgage Co.* (1996) 41 Cal.App.4th 1410, 1421.) However, a unilateral mistake of law is a basis for rescission "only when 1) all parties think they know and understand the law but all are mistaken in the same way, or 2) when one side misunderstands the law at the time of contract and the other side knows it, but does not rectify that misunderstanding." (*Ibid.*) Appellants do not contend, and the record does not reflect, that either of these circumstances existed. To the contrary, the exhibits submitted with the Singletons' motion to enforce, particularly appellants' counsel's August 8, 2018 letter and October 11, 2018 e-mail, undermine any contention that appellants misunderstood the settlement agreement. Instead, these

22

communications reflect a consistent understanding that appellants were required to remove the podocarpus if they could not trim it to their highest roofline.

V.

*The Trial Court's Order Was Supported by Substantial Evidence*

Appellants raise two challenges to the trial court's factual findings in support of its decision to order removal of the tree. First, they argue that once the trial court rejected the arborist's opinion that the tree could not be trimmed further and remain healthy, it lacked any evidence to support its determination that they were obligated to remove the tree. Second, they object to the court's implied finding that the apex of their gazebo qualified as their "highest roofline."

As noted *ante*, the trial court's factual findings on a motion to enforce a settlement agreement are reviewed for substantial evidence. (*Machado*, *supra*, 39 Cal.App.5th at p. 790.) "Consistent with the venerable substantial evidence standard of review, and with our policy favoring settlements, we resolve all evidentiary conflicts and draw all reasonable inferences to support the trial court's finding that these parties entered into an enforceable settlement agreement and its order enforcing that agreement." (*Osumi*, *supra*, 151 Cal.App.4th at p. 1360.) Appellants' first challenge is based on the following findings in the trial court's minute order:

> "The arborist's report does not demonstrate that trimming it to the roofline would compromise the health of the tree. Instead, Mr. Safford says lowering the canopy to the agreed-upon height would 'surely result in decay at the point where new growth would sprout' and compromise the health of the tree. Mr. Safford did not state that the required trimming would kill or substantially injure the tree. However, since Friedberg/Bunge are apparently of the view that the tree

23

cannot be reduced to the agreed-upon height, it must be removed and replaced."

Appellants argue the trial court erred when it construed the arborist's opinion as failing to demonstrate the tree would not "remain healthy" within the meaning of the settlement agreement if it were trimmed further. Having adopted this view of the arborist's report, appellants contend, the court erred when it nevertheless ordered them to remove and replace the tree.

We agree there are some ambiguities in the trial court's reasoning on this issue. "A condition precedent is one which is to be performed before some right dependent thereon accrues, or some act dependent thereon is performed." (Civ. Code, § 1436.) " 'The existence of a condition precedent normally depends upon the intent of the parties as determined from the words they have employed in the contract.' " (*Pfeifer v. Countrywide Home Loans, Inc.* (2012) 211 Cal.App.4th 1250, 1267.) Here, the removal of the podocarpus tree was conditioned on the arborist's determination that it could not "be trimmed [to appellants' highest roofline] and remain healthy." The court may have construed appellants' argument as a concession that the condition precedent to the tree's removal was satisfied, or as a waiver of the condition. (See *Storek & Storek, Inc. v. Citicorp Real Estate, Inc.* (2002) 100 Cal.App.4th 44, 58, fn. 11 [party may waive a condition precedent to performance under a contract].) On the other hand, if the court read the arborist's report as failing to show the tree could not withstand more trimming, the court lacked a contractual basis for ordering removal of the tree; the court should instead have enforced the agreement by ordering further trimming to the highest roofline.

Regardless, we uphold the court's decision because substantial evidence supported its finding that the condition precedent to the removal of the tree had been met. In reviewing for substantial evidence, we consider all

24

reasonable inferences and resolve them in favor of the court's order enforcing the settlement. (*Osumi, supra*, 151 Cal.App.4th at p. 1360.) Moreover, " '[w]e uphold judgments if they are correct for any reason, "regardless of the correctness of the grounds upon which the court reached its conclusion." [Citation.] "It is judicial action and not judicial reasoning which is the subject of review . . . ." ' " (*In re Jonathan B.* (1992) 5 Cal.App.4th 873, 876.)

As appellants correctly note, this aspect of the court's decision depended entirely on the arborist's July 11, 2018 report. Thus, there was no conflicting evidence; there were merely conflicting inferences drawn from the same document, namely the trial court's view that the report did not demonstrate further trimming would substantially injure the tree, and appellants' contention that it did. (At the time, appellants were claiming this counseled *against* any further trimming of the tree.) When reviewing for substantial evidence, "all *reasonable inferences* from the evidence (all conflicts already having been properly resolved) must be drawn in favor of the prevailing party." (*Le v. Pham* (2010) 180 Cal.App.4th 1201, 1205-1206.) The arborist's report stated that "[t]o reduce the canopy to the level of the apex of the gazebo would *seriously degrade the health* and dignity of this tree." (Italics added.) This language can reasonably be interpreted to mean that trimming the tree to the apex of appellants' gazebo *would* substantially injure the tree.[10] Because the arborist's report supports the reasonable inference the tree would not "remain healthy" if trimmed further, the report

---

10    The trial court characterized the settlement term "remain healthy" to mean the tree would not be killed or substantially injured. Appellants dispute the court's view that "remain healthy" meant the tree would not be killed by the trimming. However, they do not dispute that the tree would "remain healthy" if it was not substantially injured by the trimming.

was substantial evidence supporting the court's finding that the condition precedent to removal of the tree had been satisfied.

Appellants make a related argument, namely that the court erred when it refused to consider their arborist's supplemental declaration. However, appellants offered this evidence to show further trimming of the podocarpus would "risk the survivability of the tree." If accepted, the supplemental declaration would merely have served as additional support for the court's finding that the tree could not be trimmed further and had to be removed. Thus, any perceived error in rejecting it was harmless. (§ 475 ["No judgment, decision, or decree shall be reversed or affected by reason of any error, ruling, instruction, or defect, unless it shall appear from the record that such error, ruling, instruction, or defect was prejudicial . . . ."]; see *Zhou v. Unisource Worldwide* (2007) 157 Cal.App.4th 1471, 1480 ["The trial court's error in excluding evidence is grounds for reversing a judgment only if the party appealing demonstrates a 'miscarriage of justice'—that is, that a different result would have been probable if the error had not occurred."].)

Finally, appellants contend there was insufficient support for the court's finding that the apex of their gazebo was the "agreed-upon height" to which the tree needed to be trimmed. This is another forfeited position; not only did appellants fail to assert it in the trial court, they effectively conceded it, writing in their opposition to the Singletons' motion to enforce that the report showed "trimming to the roof line would jeopardize the tree's health" and, in the same brief, referring to the apex of their gazebo as "Defendants'

[i.e., appellants'] roofline." In other words, appellants used the apex of the gazebo as the reference point for the highest roofline on their property.[11]

Moreover, substantial evidence supported the court's determination that the apex of appellants' gazebo was their highest roofline, the "agreed-upon height" to which the tree needed to be reduced. " '[S]ubstantial evidence includes circumstantial evidence and the reasonable inferences flowing therefrom.' " (*Roy v. Superior Court* (2011) 198 Cal.App.4th 1337, 1349.) The arborist's report was addressed to Friedberg; was dated July 17, 2018, the deadline in the settlement agreement; and began with the statement, "[t]his brief report and proposal follows the inspection of your large Podocarpus gracilior that you requested I make to consider reducing its height to accommodate your neighbor's view." These details indicate the arborist's reliance on the apex of appellants' gazebo was not arbitrary, but rather had a rational connection to the settlement requirement to reduce the tree to appellants' highest roofline. Appellants moved forward and had the tree trimmed based on the arborist's recommendation, an indication they thought he had identified the correct roofline within the meaning of the settlement agreement.[12]

---

[11] Appellants' counsel similarly acknowledged that the apex of the gazebo was the relevant benchmark during the March 1 hearing. Counsel stated, "we read [the arborist's] report"—which specifically referred to the apex of the gazebo—"to say that the health and dignity [of the tree] are going to be impaired if you trim it to the roofline."

[12] Although appellants later took the position that a rooftop antenna qualified as their "highest roofline," this was not a legitimate interpretation of the settlement agreement. (*Ante*, fn. 8.) Similarly, the fact that the Singletons at one point argued for a *lower* roofline than the apex of the gazebo does not demonstrate the trial court's interpretation of the agreement was erroneous.

In sum, the factual findings in support of the court's determination that the settlement agreement required appellants to remove the podocarpus tree were supported by substantial evidence.

## DISPOSITION

The trial court's March 22, 2019 minute order is affirmed.  Respondents are entitled to their costs on appeal.

GUERRERO, J.

WE CONCUR:

BENKE, Acting P. J.

HALLER, J.